```
               UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
                 Civil No. 11-3236(DSD/JJK)
```

Matthew LaCroix, as an
individual and as a
representative of the classes,

       Plaintiff,

v.                                                  **ORDER**

U.S. Bank, N.A.,

       Defendant.

      Kai H. Richter, Esq., E. Michelle Drake, Esq. and Nichols
      Kaster, PLLP, 80 South Eighth  Street, Suite 4600,
      Minneapolis, MN 55402, counsel for plaintiff.

      Vernle C. Durocher, Jr., Esq., Kristin K. Zinsmaster,
      Timothy J. Droske, Esq., and Dorsey & Whitney, LLP, 50
      South Sixth Street, Suite 1500, Minneapolis, MN 55402,
      counsel for defendant.

This matter is before the court upon the motion to dismiss by defendant U.S. Bank, N.A. (U.S. Bank). Based on a review of the file, record and proceedings herein, and for the following reasons, the court grants the motion.

**BACKGROUND**

This putative class action arises from the issuance of force-placed insurance by U.S. Bank. On November 15, 2005, plaintiff Matthew LaCroix obtained a loan from nonparty TD Banknorth, N.A. (T.D. Bank) in the amount of $112,400. The loan is secured by a mortgage (Mortgage) of property located in Manchester, Connecticut.

See Compl. ¶ 18.  TD Bank assigned LaCroix's Mortgage to U.S. Bank, who is currently the lender-in-interest, on November 15, 2005.  Id. ¶ 19.

The Mortgage included a provision (Hazard Provision) governing insurance:

> **Fire, Flood and Other Hazard Insurance.**
> [1][1] Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. [2] This insurance shall be maintained in the amounts and for the periods that Lender requires. [3] Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary.

Id. Ex. 1 ¶ 4.

LaCroix's property was initially not part of a Special Flood Hazard Area (SFHA).  Id. ¶ 20.  In September 2008, the Federal Emergency Management Agency (FEMA) published a flood-map revision and placed LaCroix's property in an SFHA zone.  Id.  The National Flood Insurance Act (NFIA) and the Flood Disaster Protection Act (FDPA) require insurance for any improved property in an SFHA zone.[2]  Specifically, flood insurance is required in "an amount at

---

[1] The court numbers each sentence in the Hazard Provision for ease of discussion.

[2] The FDPA amended the NFIA in 1973 and created the requirement that property in SFHA zones maintain flood insurance. See Flood Disaster Protection Act of 1973, Pub. L. No. 93-234, 87
(continued...)

2

least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the Act with respect to the particular type of property, whichever is less." 42 U.S.C. § 4012a(b)(1).  The maximum limit of coverage available under the NFIA for residential property is $250,000.  Id. § 4013(b)(2); 44 C.F.R. § 61.6.

On November 16, 2009, U.S. Bank sent LaCroix notice that he was required to "maintain flood insurance in an amount at least equal to the lesser of: (1) The replacement cost of [his] dwelling; [or] (2) The maximum available under the National Flood Insurance Program, currently $250,000.00."  Id. ¶ 24; id. Ex. 3.  The notice also stated that U.S. Bank would purchase lender-placed insurance if LaCroix did not submit proof of "adequate flood insurance coverage within 45 days."  Id. ¶ 24; id. Ex. 3.  The notice also explained that lender-placed insurance "may be more expensive than you [will be] able to obtain on your own."  Id. ¶ 24; id. Ex. 3.

On January 27, 2010, U.S. Bank notified LaCroix that it had force placed insurance (Policy I), effective January 1, 2010, because of the "shortage in coverage between [his] required flood coverage and [his] current flood insurance policy."  Id. ¶ 27; id. Ex. 4.  Policy I provided $64,488 in coverage and had a $580 premium.  Id. ¶ 28; id. Ex. 5.  The policy stated that "THIS

---

[2](...continued)
Stat. 975.  The two acts are used interchangeably throughout the order.

INSURANCE WILL NOT PROVIDE AN AMOUNT OF COVERAGE GREATER THAN THE NET AMOUNT YOU OWE ON THE MORTGAGE." Id. ¶ 28; id. Ex. 5. Policy I also stated that "[c]overage under this policy will only apply if the loss to the building exceeds the amount of coverage provided by your flood insurance policy." Id. ¶ 28; id. Ex. 5.

LaCroix's condominium association maintained $1,110,200 in flood insurance, and his pro-rata share resulted in $69,387.50 of coverage (Condominium Policy). Id. ¶ 23; id. Ex. 2. Between the Condominium Policy and Policy I, LaCroix's total flood insurance equaled $133,875.50. Id. ¶ 29. At that time, the principal balance remaining on LaCroix's Mortgage was approximately $103,600. See id.

On November 24, 2010, U.S. Bank sent LaCroix a second flood-insurance notice, explaining that he "still [did] not have sufficient coverage." Id. ¶ 31; id. Ex. 6. The notice stated that if U.S. Bank did "not receive [notice of] adequate flood insurance coverage by 11/9/2010,[3] then as a federally regulated lender, U.S. Bank [would be] required to lender place coverage." Id. ¶ 31; Ex. 6. On December 15, 2010, U.S. Bank sent LaCroix an updated notice of force-placed insurance. Id. ¶ 32; id. Ex. 7. The new policy (Policy II) provided $93,814 in coverage and had an $844 premium. Id. ¶ 32; id. Ex. 8. Policy II had a backdate of November 9, 2010, and replaced Policy I. See id. ¶ 32 n.5; id. Ex. 8. Policy II

---

[3] This date was fifteen days before the date of the notice.

4

reiterated that "THIS INSURANCE WILL NOT PROVIDE AN AMOUNT OF COVERAGE GREATER THAN THE NET AMOUNT YOU OWE ON THE MORTGAGE." Id. ¶ 34; id. Ex. 8.  Policy II also stated that "[c]overage under this policy will only apply if the loss to the building exceeds the amount of coverage provided by your flood insurance policy."  Id. ¶ 34; id. Ex. 8.

LaCroix then contacted U.S. Bank regarding the additional coverage.  In response, on January 3, 2011, U.S. Bank explained that FEMA Guidelines require that "flood insurance coverage for a condominium unit must be equal to the replacement cost of the building divided by the number of units in the building." Id. ¶ 36; id. Ex. 9.

On November 2, 2011, LaCroix filed this class-action complaint alleging breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty and violation of the Connecticut Unfair Trade Practices Act (CUTPA). U.S. Bank moves to dismiss for failure to state a claim.

## DISCUSSION

**I.   Standard of Review**

To survive a motion to dismiss for failure to state a claim, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009)

5

(quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)). "A claim has facial plausibility when the plaintiff [has pleaded] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)). Although a complaint need not contain detailed factual allegations, it must raise a right to relief above the speculative level. See Twombly, 550 U.S. at 555. "[L]abels and conclusions or a formulaic recitation of the elements of a cause of action are not sufficient to state a claim." Iqbal, 129 S. Ct. at 1949 (citation and internal quotation marks omitted).

**II. Choice of Law**

In diversity cases, the court applies "the choice of law principles of the state in which the district court is located." Highwoods Props. Inc. v. Exec. Risk Indem., Inc., 407 F.3d 917, 920 (8th Cir. 2005) (citation omitted). Minnesota courts generally enforce the parties' agreement regarding choice of law, absent evidence that the agreement was made in bad faith or in an attempt to evade the law of Minnesota. Hagstrom v. Am. Circuit Breaker Corp., 518 N.W.2d 46, 48 (Minn. Ct. App. 1994); see Miliken & Co. v. Eagle Packaging Co., 295 N.W.2d 377, 380 n.1 (Minn. 1980). In this action, the Mortgage states: "This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located." Compl. Ex. 1 ¶ 14. The property is

located in Manchester, Connecticut. See id. ¶ 13. There is no evidence of bad faith or any attempt to evade the law of Minnesota. Therefore, the court applies the substantive law of Connecticut.

**III. Breach of Contract**

Under Connecticut law, a claim for breach of contract requires "formation of an agreement, performance by one party, breach of the agreement by the other party and damages." Chiulli v. Zola, 905 A.2d 1236, 1243 (Conn. App. Ct. 2006) (citation omitted). LaCroix argues that it was a breach of contract for U.S. Bank to require flood insurance in excess of the principal balance of the Mortgage. In response, U.S. Bank argues that it had discretion to determine the applicable amount of flood insurance.[4]

Construction of a mortgage is governed by the principles of contract interpretation. See Jancewicz v. 1721, LLC, 39 A.3d 782, 784-85 (Conn. App. Ct. 2012). "Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." Ass'n Res., Inc. v. Wall, 2 A.3d 873, 898 (Conn. 2010) (citation omitted). When interpreting a contract, "the intent of the parties

---

[4] U.S. Bank concedes that LaCroix's breach of contract claim is not preempted by the National Bank Act (NBA). See Def.'s Mem. Supp. 19; see also 12 C.F.R. § 34.4(b). U.S. Bank does argue, however, that LaCroix's remaining claims are preempted by the NBA. The court need not answer this question, because all of LaCroix's remaining claims fail irrespective of preemption.

is to be ascertained by a fair and reasonable construction of the written words and ... the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." Conn. Light & Power Co. v. Lighthouse Landings, Inc., 900 A.2d 1242, 1253 (Conn. 2006) (citation omitted). "Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." Id. at 1253. (citation omitted).

LaCroix argues that only the third sentence of the Hazard Provision applies to flood insurance. In support, LaCroix explains that the third sentence contains specific language regarding flood insurance that conflicts with the general language in the second sentence of the Hazard Provision. The third sentence requires flood insurance "to the extent required by the Secretary [of HUD]," whereas the second sentence states that "insurance shall be maintained in the amounts and for the periods that Lender requires." Compl. Ex. 1 ¶ 4. In response, U.S. Bank argues that the Hazard Provision is unambiguous and provides it discretion to determine the applicable amount of flood insurance.

Specific provisions of a contract control when in conflict with general provisions. See Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp., 130 S. Ct. 2433, 2457 (2010). There is, however, no conflict or ambiguity within the Hazard Provision. "The first two

sentences [of the Hazard Provision] afford the insurer discretion to determine the amount of hazard insurance that the mortgagor must maintain," and "[t]he third sentence merely specifies the required minimum coverage for flood insurance." Kolbe v. BAC Home Loans Servicing, L.P., No. 11-10312, 2011 WL 3665394, at *4 (D. Mass. Aug. 18, 2011) (citation omitted). But see Wulf v. Bank of Am., N.A., 798 F. Supp. 2d 586, 588-89 (E.D. Pa. 2011) (affirming decision by magistrate judge who found hazard language ambiguous, but noting that decision was "incongruous" with FEMA recommendations and could have benefitted from additional briefing). Indeed, such an interpretation aligns with the HUD requirement that "a special condition ... be included in the mortgage commitment, to obtain and to maintain NFIP flood insurance coverage." 24 C.F.R. § 203.16a(a)(2). In other words, the third sentence is required by law and does not limit the amount of flood insurance that the lender may require.

LaCroix also argues that the first sentence of the Hazard Provision cannot pertain to flood insurance, because it uses the specific language "including fire," without a corresponding reference to "floods or flooding." According to LaCroix, a contrary interpretation would render superfluous the third sentence of the Hazard Provision. A necessary implication of LaCroix's argument, however, is that the first sentence of the Hazard Provision only applies to fire, and such an interpretation would

9

contradict the immediately preceding language requiring insurance for "any hazard[], casualt[y], and contingenc[y]."  Compl. Ex. 1 ¶ 4; see Christensen v. Harris Cnty., 529 U.S. 576, 583 (2000) (noting that expression of one example does not suggest exclusion of others when context does not indicate exhaustive list). Moreover, the plain meaning of this language encompasses "floods or flooding."  See Kolbe, 2011 WL 3665394, at *3 (citation omitted); Custer v. Homeside Lending, Inc., 858 So.2d 233, 247 (Ala. 2003) (explaining that mortgage language, which included "other hazards, casualties and contingencies," covered flooding).[5]  Therefore, the plain meaning of the hazard provision provides U.S. Bank discretion to set the applicable amount of flood insurance, and the complaint fails to state a claim for breach of contract.

**IV.  Covenant of Good Faith and Fair Dealing**

"[E]very contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement."  De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 849 A.2d 382, 388 (Conn. 2004) (citation and internal quotation marks omitted).  "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the

---

[5] Further, it makes sense to omit reference to "floods or flooding" in the first sentence of the Hazard Provision considering that only a specific group of properties in SFHA zones are subject to the NFIA flood-insurance requirement.

plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." Renaissance Mgmt. Co. v. Conn. Hous. Fin. Auth., 915 A.2d 290, 298 (Conn. 2007) (alteration in original). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." 19 Perry St., LLC v. Unionville Water Co., 987 A.2d 1009, 1025 (Conn. 2010) (citation omitted). "Bad faith means more than mere negligence; it involves a dishonest purpose." Id. at 1025-26 (citation omitted).

LaCroix alleges several breaches of the covenant of good faith and fair dealing, including charges for worthless coverage, backdated coverage, receipt of kickbacks, excessive coverage and misrepresentation of flood-insurance requirements.

### A.  Worthless Coverage

LaCroix first argues that U.S. Bank charged him for coverage that was not provided. In support, LaCroix explains that both notices of force-placed coverage stated that "THIS INSURANCE WILL NOT PROVIDE AN AMOUNT OF COVERAGE GREATER THAN THE NET AMOUNT YOU OWE ON THE MORTGAGE." Compl. Exs. 5, 8. As such, LaCroix argues that the policies were worthless to the extent that they, in conjunction with the Condominium Policy, exceeded the outstanding

11

principal balance of the Mortgage. The court disagrees. First, the statement is true, neither policy provides a coverage amount greater than LaCroix's mortgage. Further, boilerplate language in the Mortgage cannot be understood to override the specific, stated amount of coverage. See id. Ex. 5 ("Amount of Coverage: $64,488"); id. Ex. 8 ("Amount of Coverage: $93,814"); see also Shiftlet v. Allstate Ins. Co., 451 F. Supp. 2d 763, 774 (D.S.C. 2006) ("Plaintiff may claim damages in the amount of the contractually stated amount of coverage indicated on the face of the Policy ...."). Therefore, no "worthless" coverage existed, and this claim fails.

### B. Backdated Coverage

LaCroix next argues that it was improper for U.S. Bank to purchase backdated flood insurance. Policy I was dated January 27, 2010, and backdated to January 1, 2010. See Compl. Ex. 5. Similarly, Policy II was dated December 15, 2010, and backdated to November 9, 2010. See id. Ex. 8. Backdating policies, however, ensures that the property is continuously covered in the event that a loss occurs during a period of insufficient coverage. See Webb v. Chase Manhattan Mortg. Corp., No. 2:05-cv-0548, 2008 WL 2230696, at *19 (S.D. Ohio May 28, 2008). Moreover, the backdating was for a period of less than two months, and such a practice cannot allow

a plausible inference of a "design to mislead" or "involve[] a dishonest purpose." 19 Perry St., LLC, 987 A.2d at 1025-26. Therefore, dismissal of this claim is warranted.

### C.  Receipt of Kickbacks

LaCroix next argues, "[o]n information and belief," that U.S. Bank received kickbacks or commissions when force placing his policies. In support, LaCroix attaches an internet article outlining the procedures that banks take when force placing insurance. The article neither identifies U.S. Bank nor LaCroix's insurance provider, American Security Insurance Company (ASIC).[6] See Compl. Ex. 11. Also, LaCroix explains that ASIC is alleged to have paid commissions to other lenders. See Hofstetter v. Chase Home Fin., LLC, No. C 10-01313, 2011 WL 1225900, at *3 (N.D. Cal. Mar. 31, 2011). In response, U.S. Bank argues that such allegations fail under Twombly.

The Eighth Circuit Court of Appeals has yet to address whether a pleading based on "information and belief" is sufficient to state a claim. Other courts reach different conclusions. Compare Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) ("The Twombly plausibility standard, which applies to all civil actions, does not prevent a plaintiff from pleading facts alleged 'upon information and belief' where the facts are peculiarly within the

---

[6] At oral argument, LaCroix explained that ASIC is a subsidiary of an insurance company discussed in Exhibit 11. There is no corresponding allegation in the complaint.

possession and control of the defendant.") (citations omitted); and Frerck v. Pearson Educ., Inc., No. 11-cv-5319, 2012 WL 1280771, at *3 (N.D. Ill. Apr. 16, 2012) (collecting cases that allow "information and belief" pleading), with Harmon v. Unisys Corp., 356 F. App'x 638, 641 (4th Cir. 2009) ("conclusory allegations" made upon "information and belief" are "insufficient to defeat a motion to dismiss"); and Solis v. City of Fresno, No. 1:11-CV-00053, 2012 WL 868681, at *8 (E.D. Cal. Mar. 13, 2012) ("In the post-Twombly and Iqbal era, pleading on information and belief, without more, is insufficient to survive a motion to dismiss for failure to state a claim."); and Bright v. Evonik Cyro, LLC, No. 3:11-cv-00180, 2012 WL 811221, at *2-3 (E.D. Ark. Mar. 12, 2012) (same).

The court need not answer the specific question of whether "information and belief" pleading is sufficient to state a claim for relief, because LaCroix's complaint contains no factual support underlying the allegation that U.S. Bank profited from the force-placed policy. Alleging that nonparty ASIC has engaged in kickback schemes with other lenders, without specific facts regarding LaCroix's insurance policy or U.S. Bank's protocol regarding force-placed insurance, is purely speculative and not sufficient to state a claim for relief. Therefore, dismissal of this claim is warranted.

**D.   Excessive Coverage**

LaCroix also argues that U.S. Bank provided excessive coverage. As already discussed, the Mortgage allowed insurance "in the amounts and for the periods that [U.S. Bank] requires." Compl. Ex. 1 ¶ 4. Therefore, dismissal of this claim is warranted.

**E.   Misrepresentation of Flood-Insurance Requirements**

**1.   Letter Dated November 16, 2009**

The first notice of insufficient coverage stated that "[t]he coverage amount on [your] flood insurance policy ... is insufficient to meet the requirements of the Flood Disaster Protection Act." Compl. Ex. 3. Further, the notice stated: "You should, at your expense, maintain flood insurance in an amount at least equal to the lesser of: (1) The replacement cost of your dwelling; [or] (2) The maximum available under the National Flood Insurance Program, currently $250,000.00." Id. LaCroix argues that the FDPA only requires flood insurance up to the outstanding principal balance of the loan, and thus U.S. Bank misrepresented federal law. The court disagrees.

Since LaCroix's flood insurance coverage was less than the outstanding principal balance on the Mortgage, it was proper for the first paragraph of the November 16, 2009, notice to state that LaCroix's flood insurance was less than that required by law. Compare id. ¶ 23 (Condominium Policy Coverage: $69,387.50), with id. ¶ 29 (Outstanding Principal Balance: $103,600). Further, it

15

was acceptable for U.S. Bank to request flood insurance at replacement value. U.S. Bank did not claim to represent federal law. Instead, it stated that LaCroix "*should*, at [his] expense, maintain flood insurance in an amount at least equal to ... [t]he replacement cost" of his condominium. Id. Ex. 3 (emphasis added). This permissive recommendation is acceptable given that the FDPA only sets a minimum coverage requirement. 42 U.S.C. § 4012a(b)(1). Indeed, FEMA Guidelines[7] explain that insuring a condominium building to its full replacement value "is the correct way to insure a residential condominium building against flood loss."[8] See FEMA, Nat'l Flood Insurance Program, Mandatory Purchase of Flood Insurance Guidelines 46 (2007) [hereinafter FEMA Guidelines].[9] Thus, U.S. Bank did not misrepresent federal law in its November 16, 2009, letter.

---

[7] Agency guidelines are not "controlling upon courts by reason of their authority, [but they] do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65 (1986)

[8] LaCroix argues that this language only applies to condominium buildings and not individual units. This argument fails, because if each unit is not insured to its full replacement value, it would be impossible to insure the "building" at replacement value.

[9] The FEMA Guidelines are found at http://www.fema.gov/library/viewRecord.do?id=2954.

### 2.     **Letter Dated January 3, 2011**

Lacroix also argues that U.S. Bank misrepresented federal flood insurance requirements in its January 3, 2011, letter. Specifically, U.S. Bank stated that "flood insurance coverage for a condominium unit must be equal to the replacement cost of the building divided by the number of units in the building." Id. Ex. 9. LaCroix argues that FEMA only requires insurance up to the outstanding balance of the loan.

FEMA Guidelines require that flood insurance "on a condominium unit be at the minimum the lowest of, but may exceed ... [t]he outstanding balance of the loan." FEMA Guidelines 46. Although the outstanding balance method is the minimum, FEMA recommends that lenders "requir[e] that condominium buildings be insured ... to their full [replacement cost value]." Id. at 47; see also id. at 46 ("[T]he correct way to insure a residential condominium building against flood loss" is to obtain replacement value coverage.).

As an initial matter, the court has already determined that U.S. Bank had the contractual right to require LaCroix to retain flood insurance at replacement value, and doing so cannot be bad faith. Moreover, the January 3, 2011, letter is merely a response to LaCroix's question about why U.S. Bank required additional insurance. This mere explanation cannot be viewed as fraudulent.

17

The operative act, force placing insurance in accordance with the Mortgage, was not in bad faith. Therefore, dismissal of this claim is warranted.

## V.   Unjust Enrichment

LaCroix next raises a claim for unjust enrichment. To state a claim for unjust enrichment, a plaintiff must show: "(1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." Vertex Inc. v. City of Waterbury, 898 A.2d 178, 188 n.12 (Conn. 2006) (citation omitted). The basis for LaCroix's unjust enrichment claim is that U.S. Bank retained improper kickbacks and commissions in conjunction with purchase of force-placed insurance. As already discussed, these allegations fail under Twombly. Therefore, dismissal of this claim is warranted.

## VI.   Fiduciary Duty

LaCroix next raises a claim for breach of fiduciary duty. "A fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other ...." Cadle Co. v. D'Addario, 844 A.2d 836, 847 (Conn. 2004).

Specifically, LaCroix argues that U.S. Bank breached its fiduciary duty by purchasing unwanted flood insurance, profiting

from the purchase of flood insurance and purchasing backdated insurance. See Compl. ¶ 74. Even assuming that a fiduciary relationship exists between the parties, LaCroix's claim fails. As already discussed, U.S. Bank did not breach the Mortgage and both the kickback and backdated-policy arguments fail. Therefore, dismissal of LaCroix's fiduciary duty claim is warranted.

**VII. CUTPA**

Under CUTPA "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). To determine whether a practice violates CUTPA, a court considers: "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise ...; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." Monetary Funding Grp., Inc. v. Pluchino, 867 A.2d 841, 413 (Conn. App. Ct. 2005) (citation omitted). "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." Naples v. Keystone Bldg. & Dev. Corp., 990 A.2d 326, 337 (Conn. 2010) (citation omitted).

LaCroix argues a violation of CUTPA based on U.S. Bank's alleged breach of contract. Because U.S. Bank did not breach the

Mortgage, dismissal of this claim is warranted. Moreover, Connecticut has set forth a three-part substantial injury criterion: "(1) [the injury] must be substantial, (2) it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) it must be an injury that consumers themselves could not reasonably have avoided." Hartford Elec. Supply Co. v. Allen-Bradley Co., 736 A.2d 824, 843 (Conn. 1999) (citation omitted). The insurance conferred a benefit on LaCroix, and he could have avoided any alleged injury by purchasing his own flood insurance. Therefore, for this additional reason, dismissal of this claim is warranted.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that the defendant's motion to dismiss [ECF No. 4] is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  June 20, 2012

s/David S. Doty
David S. Doty, Judge
United States District Court